UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PUSHPA K. PATEL,                              :
                                              :
                          Plaintiff,          :
                                              :          **MEMORANDUM & ORDER**
            -against-                         :
                                              :          10-CV-04617 (ENV)
CAROLYN W. COLVIN, Acting Commissioner        :
of Social Security,[1]                        :
                                              :
                          Defendant.          :
------------------------------------------------------------x

VITALIANO, D.J.

　　　Pursuant to 42 U.S.C. § 405(g), plaintiff Pushpa K. Patel seeks review of the

final order of the Commissioner of the Social Security Administration (the

"Commissioner," or "SSA") denying her application for disability benefits under

the Social Security Act ("the Act"). She seeks reversal of the Commissioner's

decision and remand for a calculation of benefits, or, in the alternative, remand for

a rehearing before a new administrative law judge ("ALJ"). The parties have filed

cross-motions under Federal Rule of Civil Procedure 12(c) for judgment on the

pleadings. For the reasons discussed below, the Commissioner's motion is denied,

and Patel's motion is granted to the extent that the Commissioner's order is vacated

and the case remanded for a rehearing before a different ALJ.

---

[1]　As of February 14, 2013, Carolyn W. Colvin replaced Michael Astrue as the
Acting Commissioner of Social Security. As a result, Carolyn W. Colvin is
substituted as a party to this action. *See* Fed. R. Civ. P. 25(d). The Clerk is
directed to amend the caption to reflect the change.

## Background

I.    **Procedural History**

The procedural history here is, indeed, tortuous. Patel initially applied for disability benefits on April 17, 2001, based on a claim of severe back pain resulting from a work injury she had suffered several years earlier. (Tr. at 63-65, 68).[2] SSA denied her application on June 20. Four months later, on October 16, 2002, a hearing to review the initial denial ("the 2002 hearing") was held before ALJ Hoppenfeld, who denied Patel's claim in a July 28, 2003 written decision. The ALJ concluded that Patel had the capacity to engage in sedentary work and was therefore not disabled within the meaning of the Act. (Tr. at 14-25). On February 1, 2005, SSA's Appeals Council denied review, making the ALJ's ruling the final order of the Commissioner. (Tr. at 3-5).

Obviously aggrieved, Patel commenced a an action in this district on April 1, 2005 seeking reversal of the Commissioner's order. *See Patel v. Barnhart*, No. 05-CV-01682 (SLT), Compl. (Dkt. No. 1) at 1. On March 6, 2006, upon stipulation of the parties, the Court reversed the Commissioner's decision and remanded the case for further administrative proceedings. *Id.*, Stip. and Order of Dismissal (Dkt. No. 6) at 1.[3] The mandate remanded the case to the Appeals Council, which, in turn, remanded to ALJ Hoppenfeld for further proceedings. (Tr. at 356-60). After a

---

[2]    Citations to the underlying administrative record are designated as "Tr.".

[3]    Neither the parties' stipulation nor the Court's order specifies the terms or conditions for the remand. (*Id.*)

2

rehearing on February 1, 2007 ("the 2007 hearing"), the ALJ issued a new decision on April 17, 2007 denying Patel's request for benefits once more. This time, the ALJ found her capable of engaging in light work during the relevant time period. (Tr. at 344-53). Plaintiff, following a well-trod path, again sought review by the Appeals Council, which remanded the case for further proceedings but before a different ALJ. The Appeals Council cited various legal errors, including ALJ Hoppenfeld's misapplication of the treating physician rule and her failure to consider an evaluation submitted by Lynn Mizzy Jonas, a vocational expert who had examined Patel in 2006, as reasons for the reassignment. (Tr. at 368-69).

Next on deck was ALJ Fier,[4] who held a third hearing on April 8, 2008 ("the 2008 hearing"). (Tr. at 270-314). About six weeks later, on May 28, ALJ Fier issued a written decision, which denied Patel's request for benefits. (Tr. at 466-76). Again, Patel sought review of the decision by the Appeals Council, which denied her request on June 26, 2010. (Tr. at 463-65). Patel timely filed the current action, on October 8, 2010, precipitating the parties' pending Rule 12(c) cross-motions for judgment on the pleadings.

## II. Background

Patel is a 53- year-old woman and native of India who immigrated to the

---

[4] Administrative Law Judges Marilyn Hoppenfeld and Seymour Fier have both been named in a pendant class action lawsuit, *Padro v. Astrue*, No. 11-cv-1788 (CBA) (RAM), alleging consistent bias against Social Security claimants. To the extent relief in that case, whether by decision or consent, is broader than the relief ordered, here, such broader remedial relief shall supersede any relief ordered here.

United States in 1986. (Tr. at 186). She lives in Jackson Heights with her husband, their three children, and three other relatives. (Tr. at 91). While living in India, Patel attended, but did not graduate from, college; she holds the equivalent of a high school diploma. (Tr. at 189). Her past work experience includes employment as a certified nurse's aide, hotel housekeeper, hotel attendant, fast-food restaurant worker, and part-time employee at a relative's convenience store. (Tr. at 191-94, 221). At the time of her injury, Patel was 38-years-old and working as a chambermaid at a Marriott Hotel. (Tr. at 188, 192-93). On February 12, 1998, Patel left work complaining of unbearable lower back-pain. She never returned to her job at the Marriott due to the ongoing pain. (Tr. at 194, 198).[5] It is undisputed that Patel's date last insured under the Act was December 31, 2003. (Tr. at 471).

Patel testified at the 2002 hearing that she no longer did any household chores, but remained capable of grocery shopping. (Tr. at 91, 211-12). In addition, she claimed that she rarely left her house, although she has traveled to India twice and Indiana once since the onset of her injury. (Tr. at 213-14, 282, 500). Both trips to India involved flights of at least 12 hours in each direction. (Tr. at 501). During her stays in India, each of which lasted four weeks, plaintiff neither saw a doctor nor went to the hospital. (Tr. at 504-05). Patel testified at the hearing that she could only walk about two blocks at a time, stand for fewer than ten minutes, and sit for

---

[5]   Patel's attorney explained at the 2002 hearing that Patel's back injury was not the result of an isolated incident, but was instead brought on by years of heavy lifting and strenuous physical work as a chambermaid. (Tr. at 196).

only 30 minutes without interruption. (Tr. at 205-06, 208, 505-06). She also testified

that she could not lift any weight. (Tr. at 205-06, 208, 505-06).

### a.  Medical Evidence

Between February 1998 and December 2003, Patel was treated for lower back

pain by at least eight physicians.[6] (*See* Tr. at 144-45, 379). Her doctors concurred

that she was suffering from a partial dislocation of the spine, classified as either

spondylolysis or spondylolisthesis,[7] as well as from spinal stenosis[8] and lumbar

radiculopathy.[9] (*See* Tr. at 100-04, 119-21, 125, 127-29). Three of her treating

physicians, Drs. Kaufman, Gopal and Nour, specifically described Patel as having a

"partial disability." (Tr. at 103, 120, 165).

Assessments of Patel performed in 2001 and 2002 showed a decline in her

---

[6]  Patel's treating physicians include Drs. Sireen Gopal, Ramon Vallarino, Mila Sankin, Jitendra Tolia, Arnold Goldman, John Olsewski, Justus Kaufman, and Mohamed Nour. (*See* Tr. at 144-45, 379).

[7]  Plaintiff's medical records equivocate between the term "spondylolysis" and "spondylolisthesis." At the 2002 hearing, Dr. Afalonis testified that Patel had spondylolisthesis, not spondylolysis. (Tr. at 227-28). "Spondylolysis can be defined as a break in the continuity of the pars interarticularis in the lamina. . . . If the defect permits displacement of one vertebrae on another, it is termed spondylolisthesis." Raymond M. Wolfe et al., *Low Back Pain* 101 (3d ed. 2000).

[8]  "Spinal stenosis can be defined as a narrowing of the spinal canal, and the mechanical pressure on the neural structures within will depend upon the degree of narrowing." Wolfe, at 62.

[9]  "Radicular pain is caused by compression of an inflamed nerve root . . . . If a radicular abnormality is found, the patient is diagnosed as having mechanical compression on the neural elements either from a herniated disc or spinal stenosis." Wolfe, at 108.

residual functional capacity ("RFC"). An assessment dated June 6, 2001[10] found that plaintiff had a "light RFC," could frequently lift fewer than ten pounds and occasionally up to 20, and could stand, walk, or sit for about six hours during an eight-hour workday. (Tr. at 137-42). Dr. Vallarino similarly concluded in 2001 that Patel could not sit or stand for prolonged periods, and could not lift objects over 20 pounds. (Tr. at 109). In 2002, Dr. Nour found that Patel could now only occasionally carry up to ten pounds, could not stoop, kneel, or crawl, and could not sit for more than one hour in a workday without interruption. (Tr. at 161). Testifying at the 2002 hearing at the ALJ's request, consultative medical expert Dr. Alexander Afalonis[11] stated that Patel could only occasionally lift ten pounds, would have difficulty bending or lifting, and could only stand or walk for about two hours in an eight hour day. (Tr. at 232). He suggested that Patel could only engage in employment at a "sedentary" exertion level. (Tr. at 232).

In February 2006, a little over two years after her date last insured, Patel began receiving treatment from Dr. Leonard Langman, a neurologist. (Tr. at 388). Dr. Langman concluded that, prior to 2003, Patel had developed not only lumbar

---

[10]  The signature on the RFC is illegible. (*See* Tr. at 143.) As such, counsel for the Commissioner was unable to determine who authored the evaluation. (Def.'s Mem. (Dkt. No. 11, Att. 1) at 12).

[11]  At the 2002 hearing, the medical expert's name was transcribed as "Dr. Galafonis." (Tr. at 178). ALJ Hoppenfeld directed her written correspondence to the offices of "Dr. Alexander Afalonis MD." (Tr. at 58).

radiculopathy, but also a neurological condition known as arachnoiditis,[12] a "listed impairment" under SSA regulations. (Tr. at 409); *see* 20 C.F.R. Part 404, Subpt. P, App. I, § 1.00(K)(2). Dr. Langman based his diagnosis on his review of MRI studies taken of Patel in 2003 and 2008, as well as a 2008 EMG scan. (Tr. at 409, 453). He opined, on the bases of these objective tests and his clinical observations, that Patel was "totally and permanently disabled" as a result of her medical conditions. (Tr. at 453).

Dr. Langman testified at the 2007 and 2008 hearings that Patel developed arachnoiditis due to the epidural injections she began receiving in 1998 to treat her lower back pain. (Tr. at 285-87, 517). At the 2008 hearing, another consultative medical expert, Dr. Louis Lombardi, summarized the available medical records and observed that none of Patel's previous doctors had diagnosed her with arachnoiditis. (Tr. at 292-98). However, Dr. Lombardi also acknowledged that the epidural injections Patel received could have caused her to develop arachnoiditis prior to that time. (Tr. at 299-300).

*b. Vocational Evidence*

In 2006, Patel's attorney referred her to Lynn Mizzy Jonas, formerly a

---

[12]  Arachnoiditis is "strictly defined as an inflammation of the pia-arachnoid membrane surrounding the spinal cord or the cauda equina. . . . There is no uniform clinical presentation for arachnoiditis. . . . Physical examination is not conclusive; alterations in neurologic status may be on the basis of a previous operation. . . . "[M]yelography, CT, and MRI can be helpful in confirming the diagnosis. At present there is no effective treatment for arachnoiditis. Surgical intervention has not proven effective in eliminating the scar tissue or significantly reducing the pain." Wolfe, *supra*, at 145.

vocational expert for SSA, who now provides vocational counseling services. (Tr. at 385). Jonas interviewed Patel, reviewed her medical records and Social Security file, tested her English-language speaking, reading, and writing abilities, and subjected her to manual dexterity tests designed to evaluate her capacity for unskilled machinist work. (Tr. at 379-83). The vocational expert found plaintiff's English-language reading, spelling, and arithmetic abilities were at the fifth grade level or below, and that her scores on the manual dexterity tests were extremely low, falling between the first and eighth percentiles. (Tr. at 381-83). From these tests, Jonas concluded that Patel's linguistic and physical limitations left her unsuited for any substantial gainful activity. (Tr. at 384).

At the 2007 and 2008 hearings, the ALJs elicited testimony from a different vocational expert, Andrew Pasternak, to assess whether any jobs might be available to Patel. (Tr. at 530, 309). At the 2007 hearing, ALJ Hoppenfeld asked Pasternak to discuss the kinds of jobs that Patel could perform if, "hypothetically," the ALJ determined that Patel could either work at the light level of exertion, or could only exert herself consistent with Dr. Langman's diagnosis. (*See* Tr. at 533-35). Pasternak offered that Patel could perform various jobs if she was capable of light work, (Tr. at 533), but was not capable of even sedentary work if, as Dr. Langman found, she was only able to sit for two out of eight hours in a day and stand or walk only one hour in a day. (Tr. at 534-35). At the 2008 hearing, Pasternak provided ALJ Fier with examples of three jobs that Patel could perform if the ALJ determined that she could function at the light work level of exertion. (Tr. at 311).

## Discussion

I.      **Legal Standards**

     *a.  Standard of Review*

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, a court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Courts are advised to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

     *b.  Standards for Entitlement to Benefits*

To be eligible for disability benefits, a claimant must establish disability

9

within the meaning of the Act with an onset date prior to the expiration of the claimant's insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). SSA has promulgated a five-step sequential analysis that an ALJ must use to determine whether a claimant qualifies as disabled. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits her work-related activities. *Id.* § 404.1520(a)(4)(ii). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is entitled to benefits. If not, the ALJ proceeds to the fourth step and determines whether the claimant has the residual functional capacity to perform her past relevant work.[13] *Id.* § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. *Id.* § 404.1520(e); *see also id.* § 404.1545. Fifth, if the claimant cannot perform her past work, the ALJ determines whether there is other work that the claimant could perform. *Id.* § 404.1520(a)(4)(v). At this step, the ALJ must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

---

[13] Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotations omitted).

The claimant bears the burden of proof as to the first four steps of the process for determining disability status. *See, e.g., Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that her impairment prevents her from performing past relevant work, the burden shifts to the Commissioner at the final step. *Id.* At the fifth step, the Commissioner must show that the claimant retains the residual functional capacity to perform a certain category of work, such as light work or sedentary work, and that such work is available in the national economy. *Curry v. Apfel*, 209 F.3d 117, 122-23 (2d Cir. 2000).

There has been (although it is not likely relevant to this case) a modification to this burden-shifting scheme. Subsequent SSA regulations have removed the requirement that the Commissioner bear the burden of showing residual functional capacity. 20 C.F.R. § 404.1560(c)(2); *see Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). This regulatory change certainly applies to cases in which the onset of disability postdates August 26, 2003. Yet, the Second Circuit has "left open" the question of whether the Commissioner still bears the burden of proving residual functional capacity if the claimant's onset of disability is earlier than August 26, 2003. *Mancuso v. Astrue*, 361 Fed. App'x 176 (2d Cir. 2010). However, district courts in the Second Circuit have consistently applied the old *Curry* standard when the claimant's onset of disability, as claimed here, precedes that date. *See Cataneo v.*

11

*Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *22 (E.D.N.Y. Mar. 17, 2013)

(collecting cases).

II.      **Legal Errors in the ALJ's Decision After the Third Hearing**

     *a.  Failure to Consider Relevant Non-Medical Evidence*

     Plaintiff contends that the ALJ committed legal error by ignoring the 2006

evaluation submitted by vocational expert Lynn Mizzy Jonas. (Pl.'s Mem. at 18-19).

As Patel correctly notes, nowhere in his written decision does ALJ Fier make any

reference to Jonas, to her examination of Patel, or to her evaluation of Patel's

residual capacity to do work. The Second Circuit has found legal error when "it is

clear that the Hearing Examiner totally ignored a major piece of evidence which

might well have influenced his decision." *Carnevale v. Gardner*, 393 F.2d 889, 891

(2d Cir. 1968). Moreover, the opinion of a non-medical source (or "other-source"),

in regard to the key issues of impairment severity and functional effects, may be

important and, in some cases, entitled to greater weight than an acceptable medical

source in the Commissioner's determination. *See, e.g., Kitt v. Astrue*, No. 10–CV–

839S, 2012 WL 1038627, at *5 n.7 (W.D.N.Y. March 27, 2012) ("In fact, '[a]n

opinion from a "non-medical source" who has seen the claimant in his or her

professional capacity may, under certain circumstances, properly be determined to

outweigh the opinion from a medical source, including a treating source.'" (quoting

SSR 06-03p, 2006 WL 2329939 at *4 (Aug. 9, 2006)). *See also* SSR 06-03p, 2006 WL

2329939 at *6 (opinion from "other-sources" are "important").

     Accordingly, while an ALJ is under no duty to give any weight to the opinion

12

of a non-medical source, he must still address any such findings in his decision and offer an explanation as to his determination to give it the opinion weight. *See, e.g., Hernandez*, 814 F. Supp. 2d at 183 ("[E]ven if an ALJ is 'free to conclude that the opinion of [a] 'non acceptable source' . . . [is] not entitled to any weight, the ALJ . . . [must] explain that decision.'" (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010))); *Colon v. Astrue*, No. 11-CV-210A, 2013 WL 2245457, at *10 (W.D.N.Y. May 21, 2013) ("Even assuming that Dr. Moss-King was acting only in her capacity as a Vocational Rehabilitation Counselor, it did not entitle ALJ Straub to disregard her opinion without explanation."); *Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (holding that the opinion of a social worker, a non-medical or "other" source, is "entitled to some consideration").

As a vocational expert, Jonas qualifies as a non-medical or "other" source, and her report is "a major piece of evidence which might well have influenced [the ALJ's] decision." *Carnevale*, 393 F.2d at 891. *See Colon*, 2013 WL 2245457 at *10 (explaining that while a vocational rehabilitation counselor is not an acceptable medical source, such an expert qualifies as an "other source" that cannot be disregarded without an explanation); SSR 06-03p, 2006 WL 2329939 at *2 (Aug. 9, 2006) ("'[O]ther sources' . . . include . . . rehabilitation counselors . . . ."). Although Jonas's evaluation occurred several years after the date last insured, the Second Circuit has instructed that such evidence is still important as it may speak to the severity and continuity of the claimant's impairments that existed during the relevant time period. *See, e.g., Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40,

44 (2d Cir. 1991) ("[E]vidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement [*i.e.*, insured status] was last met is pertinent evidence . . . ." (internal quotations omitted)); *see also Eiden v. Sec'y of Health, Educ. & Welfare*, 616 F.2d 63, 65 (2d Cir. 1980) (holding that evidence regarding the claimant's condition after her last date insured was still "pertinent"); *Canales*, 698 F. Supp. 2d at 342 (observing that the Second Circuit has "repeatedly" held evidence concerning the condition of an applicant subsequent to the date last insured to be "pertinent").

In spite of clear instructions from the Second Circuit and persuasive authority from other courts, ALJ Fier failed to offer *any* consideration or discussion of Jonas's evaluation in his opinion. This shortcoming is all the more egregious in light of the fact that the Appeals Council explicitly directed him to do so. (*See* Tr. at 368-69 ("There is no indication in the decision that the Administrative Law Judge considered [Jonas's vocational evaluation] . . . a non-medical source. Upon remand the Administrative Law Judge will . . . [g]ive consideration to the evidence from the non-medical source . . . .") (internal citations omitted)). The Appeals Council could not have meant for the ALJ to consider Jonas's opinion, but to keep the consideration secret. Clearly, then, the ALJ committed the same legal error by ignoring the evaluation of this "other source," and the case must be remanded for consideration of Jonas's evaluation. *See Lopez v. Sec'y of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to

14

him."); *Stewart v. Astrue*, 10-CV-3032, 2012 WL 314867, at *9 (E.D.N.Y. Feb. 1, 2012) ("[R]emand is appropriate [when] the ALJ ignores parts of the record that are vital to the Plaintiff's disability claim.").

### b. The ALJ Violated the Treating Physician Rule

Patel also argues that the ALJ improperly accorded limited weight to the testimony of her physician, Dr. Leonard Langman. (Pl.'s Mem. at 16). Dr. Langman diagnosed Patel as having two disabling medical conditions prior to her date last insured: (1) lumbar radiculopathy, the same condition diagnosed by previous physicians, and (2) adhesive arachnoiditis, which was not diagnosed by other doctors. (Tr. at 516). Dr. Langman testified that the latter diagnosis automatically qualified her for benefits under SSA's listing for "spinal arachnoiditis." (Tr. at 286-87); *see* 20 C.F.R. Part 404, Subpt. P, App. I, § 1.00(K)(2). The ALJ, however, gave "limited weight to the opinion of Dr. Langman because his treatment of the claimant did not begin until 2006, years after the claimant's date last insured on December 31, 2003." (Tr. at 474).

Under SSA regulations, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78-79 (citing 20 C.F.R. § 404.1527(c)(2)). This dictate is known as the treating physician rule. Although "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," since that question is ultimately reserved for the Commissioner, the treating physician's opinion as to *"the nature and severity of [a claimant's]*

15

*impairment(s)*" is determinative if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(c)(2)) (emphasis in original).

As a general matter, the ALJ is not required to give controlling weight to a physician who was not treating the claimant during the relevant period of disability. *Monette v. Astrue*, 269 Fed. App'x 109, 112 (2d Cir. 2008). However, the Second Circuit has "regularly afforded significant weight" to retrospective medical diagnoses by a later-treating physician. *Id.*; *see also Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (opinion of subsequent treating physician is entitled to significant weight); *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 797 (2d Cir. 1983) (same). In fact, a retrospective diagnosis by a treating physician is entitled to controlling weight if it is not "contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence," *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003), so long as it is supported by a "medically accepted clinical diagnostic technique" and, "in light of the entire record, . . . establishes the existence of a 'physical impairment'" prior to the date last insured. *Dousewicz*, 646 F.2d at 774 (internal quotations omitted).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to

give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).[14]
These factors are:

> (i) the frequency of examination and the length, nature and extent of
> the treatment relationship; (ii) the evidence in support of the treating
> physician's opinion; (iii) the consistency of the opinion with the record
> as a whole; (iv) whether the opinion is from a specialist; and (v) other
> factors brought to the [SSA's] attention that tend to support or
> contradict the opinion.

*Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).[15] The regulations also

specify that the ALJ "will always give good reasons in [his] notice of determination

or decision for the weight [he] give[s] [claimant's] treating source's opinion." 20

C.F.R. § 404.1527(c)(2); *see also id.* § 416.927(c)(2); *Schaal v. Apfel*, 134 F.3d 496,

504-05 (2d Cir. 1998) (ALJ's failure to provide "good reasons" for discounting a

treating physician's medical opinion was legal error). It is "well-settled" that the

rule for assigning weight to the opinions of a treating physician covers retrospective

diagnoses, even though the "diagnosing physician may or may not have been a

treating source" at the earlier time. *Martinez v. Massanari*, 242 F. Supp. 2d 372, 377

(S.D.N.Y. 2003) (citing, *inter alia, Shaw*, 221 F.3d at 133)).

ALJ Fier apparently found that Dr. Langman's diagnosis of "adhesive

arachnoiditis" was, as required by the evidence, predicated upon accepted

diagnostic techniques. (*See* Tr. at 472). At the 2007 hearing, Dr. Langman testified

---

[14]   This regulation has since been renumbered 20 C.F.R. § 404.1527(c)(2).

[15] *See* n. 15, *supra.*

that his diagnosis was based on his review of an MRI from April, 2003. (Tr. at 520). In 2008, he testified again, citing not only the 2003 MRI, but MRI and EMG studies taken in 2008 that were consistent with his retrospective diagnosis of adhesive arachnoiditis. (Tr. at 285-86). The ALJ's sole stated basis for giving "limited weight" to Dr. Langman's diagnosis of arachnoiditis was that "his treatment of the claimant did not began [sic] until 2006, years after the claimant's date last insured." (Tr. at 474).

The ALJ thus failed to provide "good reasons" for assigning limited weight to Dr. Langman's opinion. While it is appropriate to consider that Dr. Langman did not treat Patel until 2006, Dr. Langman's opinion may "still [be] legally entitled to significant weight." *Dousewicz*, 646 F.2d at 774; *see also Vicari v. Astrue*, No. 05-CV-4967, 2009 WL 331242, at *5 (E.D.N.Y. Feb. 10, 2009) ("Under no circumstances may the ALJ disregard the opinions of [the plaintiff's] treating physicians simply because they were offered retrospectively."). The ALJ made no effort to compare Dr. Langman's diagnosis with the record, noting only in passing that one 2002 report from one hospital had not included any "indication of araconditis [sic]." (Tr. at 473). The ALJ was not entitled to discount Dr. Langman's retrospective diagnosis without weighing his testimony against the record and analyzing it in light of the factors provided in 20 C.F.R. § 404.1527(c)(2).What is prominent in the administrative decision is that Dr. Langman's opinion as the claimant's treating physician was retrospective in its diagnosis. That fact alone cannot be the basis of the ALJ's assignment of weight.

18

The Commissioner asserts that, regardless of the ALJ's failure in this regard, Dr. Langman's opinion was "inconsistent with other substantial evidence in the record." Def.'s Br. 25. But this argument merely begs the question: the crux of ALJ Fier's error is that he did not, assuming the Commissioner's evidentiary evaluation is correct, explain *why* Dr. Langman's opinion and testimony were inconsistent with other record evidence. (Tr. at 472-73). Nor did the ALJ discuss his analysis (if any) of the factors described in C.F.R. § 404.1527(c)(2), and how he weighed Dr. Langman's opinion in light of those factors. Second Circuit precedent leaves no doubt that a failure of this nature is a legal error mandating reversal and remand. *See, e.g.*, *Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Furthermore, in spite of the ALJ's declaration to the contrary, the Court's review of the record reveals no inherent contradiction between Dr. Langman's diagnosis and the diagnoses offered by other doctors. In response to Dr. Langman's opinion, the ALJ relied on consultative medical expert Dr. Lombardi, who concluded merely that medical records from Patel's other doctors did not also include a diagnosis of arachnoiditis. (Tr. 292-298). This does not amount to a contradiction of Dr. Langman's diagnosis by either Dr. Lombardi or Patel's prior treating physicians. In fact, Dr. Lombardi conceded that Patel had been

19

experiencing severe back pain through 2003, and that her epidural injections could have caused her to develop arachnoiditis prior to that time. (Tr. at 299-300). The Second Circuit has notably "refused to uphold an ALJ's decision to reject a treating physician's diagnosis merely on the basis that other examining doctors reported no similar findings." *Rosa*, 168 F.3d at 81 (citations omitted); *cf. Rivera v. Sullivan*, 923 F.2d 964, 969 (2d Cir. 1991) (reversing ALJ's determination that earlier doctor's notes failing to diagnose disability contradicted retrospective diagnosis by later physician). The Court similarly refuses to uphold ALJ Fier's decision here, even assuming the absence of other errors the Court finds would mandate remand anyway.

Consequently, by improperly discounting Dr. Langman's diagnosis of arachnoiditis, the ALJ committed legal error, and it is one of the multiple grounds making remand appropriate. On rehearing, the ALJ assigned to the case must be wary of his or her predecessors' stumbles, and shall, as expeditiously as possible given the length of the road already traveled, accord appropriate weight to Dr. Langman's opinion after due consideration of the factors provided in C.F.R. § 404.1527(c)(2). Of course, that analysis must be clearly set forth in the administrative decision. In addition, nothing here is to be read to prevent the ALJ from requiring new opinions from prior or additional treating or consulting physicians in order to facilitate a proper consideration of Dr. Langman's medical opinion. *See* 20 C.F.R. § 404.1512(e) (requiring the Commissioner to "seek additional evidence or clarification" from treating sources whose reports "contain[]

20

a conflict or ambiguity that must be resolved" or are "inadequate for [the Commissioner] to determine whether [the claimant] is disabled").[16]

### c.  *Remand Solely for Calculation of Benefits is Not Appropriate*

Patel requests that the case be remanded solely for the calculation of the monthly benefits payable to her. (Compl. (Dkt. No. 1) at 4). Such a remedy is only appropriate "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Pratts v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Commissioner for further development of the evidence." *Rosa*, 168 F.3d at 82-83. In this case, the ALJ failed once again to consider the Jonas evaluation and appears to have improperly evaluated the testimony and diagnosis of Dr. Langman. Because it is the role of the ALJ, and not the Court, to consider such evidence in light of the record, remand solely for calculation of benefits is inappropriate here. Further evidentiary proceedings to correct the errors are warranted, regardless of whether or not new evidence is presented.

---

[16] If additional medical testimony is appropriate, it may inescapably need to come from a physician other than Dr. Langman, who will likely be unable to testify. After the 2008 hearing, Dr. Langman lost his medical license and is currently serving out a prison sentence after pleading guilty to felony Medicare fraud charges unrelated to this case. *See United States v. Langman*, No. 11-CR-0435 (KAM), Am. Judgment (Dkt. No. 36) at 1-2; *see also* New York State Department of Health Office of Professional Medical Conduct, Professional Misconduct and Physician Discipline, Physician Search, http://w3.health.state. ny.us/opmc/factions.nsf/physiciansearch?openform (search for Leonard Langman).

### d.  *A Different ALJ Shall Hear the Case on Remand*

Federal courts have the authority to remand for rehearing before a different ALJ. *Kolodnay v. Schweiker*, 680 F.2d 878, 880 (2d Cir. 1982). Among the relevant considerations are an ALJ's unwillingness to apply the appropriate legal standard and a clearly manifested bias or hostility toward any party or position. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). Here, ALJ Fier has already plainly disregarded the specific instructions of the Appeals Council by refusing to apply the treating physician rule and ignoring the report of Patel's vocational consultant. (Tr. at 369). As a result, the Court directs that the case be reassigned to a different ALJ for the hearing on remand.

### Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied. Patel's cross-motion is granted to the extent that ALJ Fier's decision is reversed, the final order of the Commissioner vacated, and the matter remanded for further proceedings consistent with this Memorandum and Order before an ALJ who has not previously been assigned to this case.

So Ordered.


Dated: Brooklyn, New York
       July 16, 2013

                                        s/ ENV

                                        ERIC N. VITALIANO
                                        United States District Judge

22